IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

RAYMOND LEE MALOY,
      Petitioner,

vs.                            Case No.:  3:13cv486/LAC/EMT

MICHAEL D. CREWS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed a motion to dismiss the petition as untimely, with relevant portions of the state court record (doc. 30).  Petitioner filed a response to the motion (doc. 33).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that the petition should be dismissed as untimely.

I.      PROCEDURAL HISTORY AND UNTIMELINESS

In Petitioner's reply to Respondent's motion to dismiss, he concedes the correctness of the procedural history set forth in Respondent's motion to dismiss, and he concedes that Respondent's analysis of the timeliness issue is correct, including Respondent's conclusion that the Section 2254

petition is untimely (*see* doc. 33 at 1).  Respondent's presentation of the procedural history is supported by the state court record (*see* doc. 30, Exhibits).[1]

Petitioner was charged in the Circuit Court in and for Santa Rosa County, Florida, with two counts of lewd or lascivious molestation of M.M., a child less than sixteen years of age (Ex. C).  The offense conduct occurred on May 23, 2001 (*id.*).  Through counsel, Petitioner filed a motion in limine in the trial court seeking exclusion of evidence of out-of-court statements of the child victim to psychologists, the opinion of any psychologist as to the child victim having post-traumatic stress disorder ("PTSD"), and other out-of-court statements of the child victim (Ex. D).  Petitioner's motion in limine was heard at an evidentiary hearing on July 24, 2002 (Ex. E).  Thereafter, the trial court ruled "that, upon laying the proper foundation for such a question, the State may ask Dr. Spencer if the alleged victim in this case suffers from PTSD and whether PTSD can be caused by sexual abuse" (Ex. F).[2]  Petitioner filed a motion for clarification of the trial court's order (Ex. G), which the court orally denied on the record during proceedings held August 2, 2002 (Ex. H).  Petitioner proceeded to trial by jury, which commenced on August 6, 2002, and concluded on August 7, 2002 (Ex. I1).  The court declared a mistrial due to the jury's inability to reach a unanimous verdict (*id.*).  Petitioner again proceeded to trial by jury, which commenced on October 29, 2002 and concluded on October 30, 2002, with the jury returning a verdict of guilty on each count (Ex. I2; K).[3]

Petitioner filed a post-verdict motion for new trial (Ex. L), which the trial court heard and denied at the commencement of sentencing proceedings on November 21, 2002 (Ex. M at 3).  The court sentenced Petitioner to two concurrent terms of 11.75 years of incarceration, followed by 3 years of probation (Ex. M at 43–50, Ex. N).

---

[1] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's motion to dismiss (doc. 30) unless otherwise indicated.  Additionally, if a cited page has more than one page number, the court cites to the "Bates stamp" page number.

[2] At the evidentiary hearing on the motion in limine, the State announced that it would not seek to introduce any child hearsay statements at trial; therefore, the trial court did not rule on that issue (*see* Ex. F).

[3] The clerk of court's trial notes and evidence list, as well as State's Exhibit #4 (an affidavit of Gail Thames), are included in Exhibit J.

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA") (Exs. O, P).  The First DCA affirmed the judgment per curiam without written opinion on February 14, 2005 (Ex. R).  Maloy v. State, 895 So. 2d 1070 (Fla. 1st DCA 2005) (Table).  Through counsel, Petitioner filed a motion for rehearing, clarification, or certification and for written opinion (Ex. S).  The appellate court denied Petitioner's motion on March 7, 2005 (id.).  Accordingly, under 28 U.S.C. § 2244(d)(1)(A), the federal limitations period for Petitioner's Section 2254 petition commenced on June 6, 2005, upon expiration of the 90-day period in which he could have sought certiorari review in the United States Supreme Court.[4]  See Kaufman v. United States, 282 F.3d 1336, 1338 (11th Cir. 2002); Sup. Ct. R. 13.3.

The federal limitations period ran **287 days** until Petitioner filed, through counsel, a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, on March 20, 2006 (Ex. U).[5]  The state circuit court held evidentiary proceedings on April 9, 2008 and

---

[4] On April 13, 2005, Petitioner filed a counseled motion for reduction or modification of sentence in the state circuit court, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. T).  The motion was summarily denied by order of the circuit court on April 27, 2005 (id.).  Not only was this Rule 3.800(c) motion initiated and resolved prior to the commencement of the federal limitations period, but a Florida Rule 3.800(c) motion arguably does not qualify as an application for "State post-conviction or other collateral review" which tolls time under 28 U.S.C. § 2244(d)(2).  See, e.g., Baker v. McNeil, 439 F. App'x 786, 787–89 (11th Cir. 2011) (unpublished), cert. denied,132 S. Ct. 1633, 182 L. Ed. 2d 236 (2012); see also Shanklin v. Tucker, No. 3:11cv357/RV/MD, 2012 WL 1398186, at *3 (N.D. Fla. Mar. 21, 2012) (unpublished), Report and Recommendation Adopted by 2012 WL 1396238 (N.D. Fla. Apr. 23, 2012) (unpublished); Johnson v. Sec'y, Dep't of Corr., No. 6:12cv1218–Orl–36TBS, 2013 WL 1786638, at *2 (M.D. Fla. Apr. 26, 2013) (unpublished).

[5] On March 17, 2006, Petitioner filed, through counsel, a motion to disqualify Judge Paul Rasmussen, pursuant to Rule 2.160 of the Florida Rules of Judicial Administration (Ex. OO).  The circuit court summarily denied the motion in an order rendered March 22, 2006 (Ex. QQ).  Petitioner filed a motion for rehearing (Ex. RR), which was summarily denied by order rendered April 13, 2006 (Ex. SS).  Following the denial of the motion to disqualify, Petitioner filed a petition for writ of prohibition in the First DCA seeking to bar Judge Paul Rasmussen from presiding in his case (Ex. TT).  The First DCA denied the petition per curiam without written opinion on September 29, 2006 (Ex. WW).  Maloy v. State, 939 So. 2d 98 (Fla. 1st DCA 2006) (Table).

Rule 2.330 of the Florida Rules of Judicial Administration (Rule 2.160 was renumbered as Rule 2.330 on September 21, 2006, see In re Amendments to the Florida Rules of Judicial Administration—Reorganization of the Rules, 939 So. 2d 966 (Fla. 2006) (Mem)) provides that a motion to disqualify shall show that "the party fears that he or she will not receive a fair trial or hearing because of specifically described prejudice or bias of the judge"; or that the judge is either an interested party to the matter, related to an interested party, related to counsel, or "is a material witness for or against one of the parties to the cause."  Id. (quoting Fla. R. Jud. Admin. 2.330(d)); see also Fla. Stat. § 38.10.  This Rule expressly provides a procedure to disqualify the trial judge assigned to the case; it does not provide a procedure for raising a legal challenge to a conviction or sentence.  Disqualification of a trial judge assigned to a case is not an attack on the constitutionality or legal correctness of a sentence or judgment, in contrast to a direct appeal,

June 3, 2008 (Ex. W).[6] The state circuit court denied Petitioner's Rule 3.850 by order rendered August 12, 2008 (Ex. AA).  Petitioner, through counsel, appealed the decision to the First DCA (Exs. BB, CC).  Petitioner filed an initial brief (Ex. CC), and then a motion to relinquish jurisdiction in the First DCA "to permit the trial court to receive evidence of the mistake or fraud perpetrated upon it" regarding his former trial counsel's testimony at the evidentiary hearing on the Rule 3.850 motion (Ex. DD).  The First DCA relinquished jurisdiction to the circuit court "for the limited purpose of permitting the trial court to consider any additional evidence relevant to appellant's postconviction claim that trial counsel was ineffective in failing to present an expert to testify regarding the lack of DNA evidence, and to enter any orders deemed appropriate" (Ex. DD).  The circuit court held evidentiary proceedings on April 30, 2009. (Ex. HH).[7]  By order rendered May 1, 2009, the circuit court denied relief (Ex. JJ).  With jurisdiction having returned to the First DCA, Petitioner filed an amended initial brief in the appellate court (Ex. KK), and the State filed notice that it would not file an answer brief (Ex. LL).  The First DCA per curiam affirmed, without written opinion, the circuit court's denial of the Rule 3.850 post-conviction motion on April 30, 2010, with the mandate issuing May 18, 2010 (Ex. MM).  Maloy v. State, 34 So. 3d 6 (Fla. 1st DCA 2010) (Table).  The federal limitations period recommenced the next day, on May 19, 2010.  See Nyland v. Moore, 216 F.3d 1264, 1267 (11th Cir. 2000) (where Florida petitioner appeals trial court's denial of post-conviction application, application remains pending until issuance of the mandate by the appellate court).  The federal deadline expired **78 days** later, on August 5, 2010 (**287 days + 78 days = 365 days**).  Any applications for post-conviction relief filed after that date did not toll the limitations period because there was nothing left to toll.  See Webster v. Moore, 199 F.3d 1256,

---

habeas action, or proceeding to set aside a conviction or correct an illegal sentence.  Therefore, neither Petitioner's motion to disqualify nor his petition for writ of prohibition qualified as a tolling motion under § 2244(d)(2).  See, e.g., Moore v. Cain, 298 F.3d 361, 366–67 (5th Cir. 2002) (concluding that because a mandamus application does not seek review of a judgment, it does not toll time under § 2244(d)(2)); Gordon v. Falk, No. 14-cv-00371-BNB, 2014 WL 1818702, at *4 (D. Colo. May 7, 2014) (unpublished) (motion to disqualify trial judge does not qualify for statutory tolling under § 2244(d)(2)); Neal v. McNeil, No. 3:09cv23/MCR/EMT, 2010 WL 298294, at *5 (N.D. Fla. Jan. 15, 2010) (unpublished) (motion to disqualify under Fla. R. Jud. Admin. is not a tolling motion under § 2244(d)(2)).

[6] The evidence list for these evidentiary proceedings, as well as Petitioner's Exhibits #1, #2 and #5 are included in Exhibit X.

[7] Petitioner's evidentiary hearing Exhibit #1, as well as State's Exhibits #1 and #2 are included in Exhibit II.

1259 (11th Cir. 2000) ("A state-court petition . . . that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled.").

Even though Petitioner does not dispute that his Section 2254 petition was untimely, for purposes of a thorough timeliness analysis, the undersigned will explain why Petitioner's second round of Rule 3.850 filings, which Petitioner initiated as a state habeas proceeding, does not save his federal petition from untimeliness.  While the appeal of Petitioner's Rule 3.850 motion was pending, Petitioner filed, on April 7, 2010, a pleading in the circuit court titled, "Petition for Writ of Habeas Corpus Florida Rule 3.850(h) Newly Discovered Evidence" (Ex. XX).[8]  By non-final order rendered September 20, 2010, the circuit court construed the pleading as a Rule 3.850 motion alleging newly discovered evidence, and struck the motion as facially insufficient and impermissibly excessive in length, with leave to file an amended motion within forty-five days (Ex. YY). Petitioner filed an amended motion by the deadline (Ex. ZZ).  Prior to the circuit court taking any action on this motion, he amended the motion (Ex. AAA).  By non-final order rendered June 29, 2011, the circuit court struck the motion as facially and legally insufficient, with leave to file an amended motion within forty-five days  (Ex. BBB).  Petitioner filed a second amended motion by the deadline (Ex. EEE).  By non-final order rendered October 12, 2011, the circuit court struck the second amended Rule 3.850 motion as facially and legally sufficient, with leave to file an amended motion within thirty days (Ex. FFF).  Instead of filing an amended motion, Petitioner filed a motion for rehearing of the non-final order (Ex. GGG), which the circuit court struck as unauthorized on November 17, 2011 (Ex. HHH).  *See* Quilling v. State, 968 So. 2d 1034 (Fla. 5th DCA 2007) ("We reject Appellant's argument that his motion for rehearing was timely filed because Florida Rule of Criminal Procedure 3.850(g) does not authorize rehearing motions directed to non-final orders dismissing without prejudice rule 3.850 motions.").  On November 18, 2011, Petitioner filed a third amended Rule 3.850 motion (Ex. III).  By non-final order rendered February 3, 2012, the state circuit court struck the third amended motion, again with leave to amend within thirty days (Ex. KKK).  On March 9, 2012, Petitioner filed a fourth amended Rule 3.850 motion (Ex. LLL).  The

---

[8] Petitioner's certificate of service reflects a date of April 8, 2010, but the date stamp of the clerk of the circuit court reflects a date of April 7, 2010 (Ex. XX at 160).  The court will give Petitioner the benefit of the earlier date.

state circuit court denied the motion by order rendered July 9, 2012, concluding that Petitioner's claim of newly discovered evidence failed to overcome the untimeliness and successiveness of the motion (Ex. MMM). Petitioner appealed the decision to the First DCA (Exs. PPP, QQQ). The First DCA affirmed per curiam without written opinion on December 27, 2012, with the mandate issuing January 23, 2013 (Ex. SSS). Maloy v. State, 104 So. 3d 1091 (Fla. 1st DCA 2013) (Table).

Because the state court's final disposition of Petitioner's second round of Rule 3.850 proceedings was based upon the determination that it was untimely as well as successive, it was not "properly filed" and thus did not qualify for statutory tolling under § 2244(d)(2). See Pace v. DeGuglielmo, 544 U.S. 408, 414, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005) ("When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d)(2)."); see also, e.g., Rich v. Sec'y for Dep't of Corr., No. 12-10441, 2013 WL 1010304, at *2 (11th Cir. Mar. 15, 2013) (unpublished) (district court did not err in determining that Rich's 2008 petition was not "properly filed" within the meaning of 28 U.S.C. § 2244(d)(2), where state court first concluded that although Rich styled his motion as an "Emergency Petition for Writ of Habeas Corpus," it was a collateral challenge to a judgment of conviction which must be raised in a Florida Rule of Criminal Procedure 3.850 motion; the state court then determined that even if his petition were construed as a Rule 3.850 motion, it was successive and untimely) (citing Pace).[9]

Even if the federal limitations period was tolled during the pendency of Petitioner's second round of Rule 3.850 proceedings, his federal petition would still be untimely. Assuming that the limitations period was tolled until the First DCA issued its mandate on January 23, 2013, the limitations would have expired **78 days later**, on April 12, 2013 (**287 + 78 = 365**). Petitioner's Section 2254 petition filed in this court on August 26, 2013, would still be untimely.[10]

---

[9] The undersigned cites Rich only as persuasive authority and recognizes that the opinion is not considered binding precedent. See 11th Cir. R. 36-2.

[10] On January 28, 2013, Petitioner filed a pro se "Motion for Modification of Sentence Due to Health Circumstances" in the state circuit court, pursuant to Rule 3.800(c) (Ex. TTT). The state circuit court summarily dismissed the motion for lack of jurisdiction by order rendered February 6, 2013 (Ex. UUU). This was a non-appealable order. See Reyes v. State, 79 So. 3d 151, 152 (Fla. 3d DCA 2012) (trial court's order denying Rule 3.800(c) motion on the merits is not appealable; therefore, appellate court has no jurisdiction to review decision); Winslow v. State, 37 So. 3d 974 (Fla. 1st DCA 2010) (same); Walters v. State, 994 So. 2d 1230 (Fla. 2d DCA 2008) (same); Adams v. State, 800 So. 2d 741 (Fla. 5th DCA 2001) (same). Not only was the Rule 3.800(c) motion not "properly filed" within the meaning

II.    "ACTUAL INNOCENCE" GATEWAY

As previously discussed, in Petitioner's reply to Respondent's motion to dismiss, he concedes that his Section 2254 petition is untimely (*see* doc. 33 at 1). Petitioner argues, though, that he is entitled to a merits review of his untimely petition because he is actually innocent of the crimes and thus may proceed through the "fundamental miscarriage of justice" gateway (*id.* at 1–6).

The actual innocence "gateway" established by the Supreme Court in <u>Schlup v. Delo</u>, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), allows a petitioner sentenced to death to "raise[ ] a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." 513 U.S. at 326–27. The "<u>Schlup</u> gateway" is meant to prevent a constitutional error at trial from causing a "miscarriage of justice" and "the conviction of one who is actually innocent[.]" *Id.* at 324. To meet the proper standard, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327 (emphasis added). The Supreme Court in <u>Schlup</u> said this about the needed evidence: "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. In reviewing this evidence, courts are not bound by the usual rules of admissibility that would govern at a trial; and guilt is considered "with reference to a reasonable doubt." *Id.* at 327. To make a colorable showing of actual innocence, "a petitioner must show that it is more likely than not that <u>no</u> reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* (emphasis added).

A.    <u>Trial Evidence</u>

To determine whether Petitioner has made a sufficient showing that it is more likely than not that no reasonable juror would have convicted him in light of the "new evidence," the court must consider all the evidence, including Petitioner's "new evidence" and the evidence heard by the jury

---

of 28 U.S.C. § 2244(d)(2), *see* <u>Artuz v. Bennett</u>, 531 U.S. 4, 9, 121 S. Ct. 361, 148 L. Ed. 2d 213 (2000) (noting that an application filed in a court lacking jurisdiction is not "property filed"), but a Florida Rule 3.800(c) motion arguably does not qualify as an application for "State post-conviction or other collateral review" which tolls time under 28 U.S.C. § 2244(d)(2), *see* <u>Baker</u>, 439 F. App'x. at 787–89.

at Petitioner's re-trial.  The evidence presented by the State at Petitioner's re-trial included testimony from (1) the victim, M.E.M., (2) Gale Thames, the victim's grandmother, (3) Thomas Richard ("Rick") Spencer, a licensed clinical psychologist, and (4) Angela Martin, the victim's mother (*see* Ex. I2).[11]  Petitioner testified in his own defense (*id.*).

Gale Thames, M.E.M.'s grandmother, testified that she met Petitioner in December of 1997, when he became the tenant of an apartment located on the same property as her home (Ex. I2 at 168).  She testified their relationship developed into an intimate, romantic relationship, and they became engaged in May of 1998, five months after they met (*id.* at 173–74).  She testified that the house in which she lived had two stories (*id.* at 170–72).  The kitchen, utility room, living room, guest bathroom, and master bedroom and bathroom were downstairs, and there were three bedrooms (one of which was also used as an office and sewing room) and a bathroom upstairs (*id.* at 171–72).  Ms. Thames testified that when Petitioner spent the night in her home, they shared the master bedroom downstairs (*id.* at 174).  She testified that Petitioner kept a bathrobe and a razor at her house (*id.* at 175).  She testified that Petitioner wore the robe most evenings, and in the mornings, they would drink coffee in their robes and dress afterward (*id.* at 176, 186).  She testified she always awoke first and made their coffee (*id.* at 185).

Ms. Thames testified that her granddaughter M.E.M. and grandson Tommy visited her home approximately two times per month, on school holidays and weekends (Ex. I2 at 179).  She testified that during their visits, each child stayed in a bedroom upstairs (*id.* at 172–73).  Ms. Thames testified that M.E.M.'s body began changing in the 6–12 months preceding May of 2001 (*id.* at 179–80).  She testified she bought M.E.M. a bra, and she noticed that M.E.M.'s waist was slimming (*id.* at 179).  Ms. Thames testified that during this time, Petitioner showed more interest in M.E.M., for example, discussing projects and interests such as horses (*id.* at 179–80).  She testified Petitioner was very attentive to M.E.M., sometimes to the exclusion of others (*id.* at 180).

Ms. Thames testified that on May 23, 2001, M.E.M. and Tommy arrived at her home in the late afternoon (Ex. I2 at 180–81, 209).  She testified she asked the children to go to bed by 8:30

---

[11] Lieutenant Jack Onkka also testified, but his testimony was limited to authentication of a witness statement provided by Gale Thames to the Santa Rosa County Sheriff's Office  (Ex. I2 at 297–99).

p.m., because she had to return the children home to their parents by 8:30 the next morning (*id.* at 182).  Ms. Thames testified that after she put the children to bed upstairs, she talked to Petitioner for a while and then went to bed before he did (*id.* at 183).  She testified that at some time during the night, she felt Petitioner come to bed (*id.* at 184).  He reached over and touched her, and then pulled his hand back (*id.*).  She testified "it was sort of a tentative kind of touch.  And . . . I wondered why he didn't hug my back . . . ." (*id.*).  She testified she awoke at 6:00 the next morning, and Petitioner was already dressed and drinking coffee (*id.* at 185).  Ms. Thames testified that the previous evening, Petitioner told her he was going to play golf the next day, and she told him she was going to move furniture (*id.* at 186).  However, that morning, Petitioner told her he would help her move furniture (*id.* at 186–87).  Ms. Thames testified that she and Petitioner made breakfast, and when she told him she was going to wake the children as she usually did, he told her he had already gone upstairs and banged on the door, but the children did not respond (*id.* at 188).  Ms. Thames testified she wondered when Petitioner had gone upstairs, because they had been together since 6:00 or 6:30 that morning, and she had not seen him go upstairs (*id.* at 188).  She also testified that Petitioner normally would not have gone upstairs, because upstairs was "off limits" to him, especially if the children were there, because they might be undressed (*id.* at 189).  Ms. Thames testified she went to M.E.M.'s bedroom, but the bed was empty, so she went to Tommy's bedroom (*id.* at 189–90).  She testified that the door was locked, so she yelled through the door that breakfast was ready and asked why the door was locked (*id.* at 190).  Ms. Thames testified M.E.M. then opened the door, and she observed that M.E.M. was stiff and trembling, her eyes were "big as saucers," and she looked scared (*id.* at 191).  She testified M.E.M. told her, "Nana, last night Ray touched me." (*id.* at 191, 225).[12]  Ms. Thames testified she responded, "Inappropriately?" (*id.* at 225).  She testified M.E.M. said yes, and she (Thames) asked "Between, you mean between the legs?" (*id.*).  M.E.M. said yes (*id.*).  Ms. Thames testified she told the children to stay there, and that she would go downstairs and "take care of it" (*id.* at 191).  Ms. Thames testified she told Petitioner what M.E.M. reported, and he responded, "No.  I didn't." (*id.* at 192).  She testified Petitioner was

---

[12] Defense counsel elicited the victim's hearsay statement from Ms. Thames (Ex. I2 at 225).

pale, quiet, and grim (*id.*).  She testified that when she touched his arm to escort him out of the house, his arm was damp with perspiration (*id.*).

Ms. Thames testified that in the few months that followed, she was conflicted (Ex. I2 at 193). She testified two months after the incident, on July 23, 2001, she initiated communication with Petitioner, and they both professed their love for each other (*id.* at 194, 226).  She testified they also resumed their sexual relationship (*id.*).  Ms. Thames testified that when the incident came up in conversation, Petitioner denied that it happened (*id.* at 226–27).  She testified that when the family discovered she had renewed her relationship with Petitioner, they would not let her see the grandchildren except at church (*id.* at 228).  She testified:

> Q [by defense counsel]:  And they [Ms. Thames' family] made it clear to you that you have to come here and make it clear to the jury that you believe your granddaughter or they will not let you back in the family, are they [sic]?
>
> A:  I'm back in my family.
>
> Q:  You're back now?
>
> A:  Yes.  I think my children have a lot to forgive.  I've hurt them deeply; I hurt myself.  I went against my own principals [sic], and it was just my emotional state.  I have no excuses; I was a foolish woman.  It was poor judgment.
>
> Q:  Well, that's why your testimony today is different from the statement that you made previously in court before and at deposition, is it not?
>
> A:  My testimony hasn't differed, it's the same.
>
> I wrote down what happened.  About two days after it happened I sat down and wrote all of that down, all of the details.
>
> Q:  I'm talking about the details you gave under oath before, and the inconsistencies in your statements.  The reason your testimony is different today is you want to get back in the good graces with your family, is that true?
>
> A:  Of course I want to be in the good graces of my family, but my testimony is not different.

(Ex. I2 at 229).  Ms. Thames testified that she told her family about her renewed relationship with Petitioner on December 5, 2001, after her deposition (*id.* at 230–31).

M.E.M. testified she was born on March 4, 1999, and was 13 years old at the time of trial (Ex. I2 at 232).  She testified she and her brother Tommy visited her grandmother's home on May 23, 2001 (*id.* at 236).  She testified she had just finished 6th grade (*id.* at 250).  She testified that Petitioner started being nicer to her when she was in 6th grade; he started talking to her and being more friendly (*id.* at 236).  She testified that prior to that, he "wasn't very welcoming" and did not seem to like children (*id.*).  M.E.M. testified it was daylight when they arrived at their grandmother's home (*id.* at 237).  She testified Petitioner was at her grandmother's home (*id.*).  M.E.M. testified she went to bed in her upstairs bedroom at approximately 8:00 p.m. (*id.*).  She testified that approximately 12:30 or 1:00 a.m., Petitioner came into her bedroom and started touching her (*id.* at 238).  She testified she was lying on her left side and dreaming that she was playing with Golden Retriever puppies, and one puppy was behind her nudging her between her legs in the back of her vaginal area with its nose (*id.* at 238–39, 253).  She testified she woke up and looked over her shoulder and noticed that someone was in the bedroom (*id.* at 239).  M.E.M. testified she realized the person was Petitioner when he turned his head and his face caught the light from a nightlight outside the bedroom (*id.* at 240).  She testified Petitioner was on his knees at the corner of the bed, and he was rubbing his hand in a circular motion on her "privates," meaning, her vagina, in the same area she had felt the dog in the dream nudging her from behind (*id.* at 240–41, 258).  She asked Petitioner, "Where's Nana?" and he responded that she was downstairs (*id.* at 240–41).  M.E.M. testified she waited a couple of seconds, and said she had to go to the bathroom (*id.* at 241).  She testified she thought that if she went to the bathroom and Petitioner saw that she was fully awake, he would leave (*id.*).  She testified that Petitioner helped her take the covers off, since one of her legs was covered, and he put his hand on her shoulder and helped her up (*id.* at 242).  She testified she went to the bathroom and locked the door (*id.*).  She then put the bathroom rug in the bathtub, with the intention of trying to sleep there, but it was very uncomfortable, so she put the rug back on the floor (*id.*).

M.E.M. testified she left the bathroom and walked back to her bedroom (Ex. I2 at 243).  She testified she saw Petitioner still in the bedroom, but she went in anyway (*id.* at 244).  When asked why she went back in, she testified she did not know why she did it (*id.*).  She testified she was scared and did not know what to do, but in retrospect, she would not have gone back into the

bedroom (*id.*).  M.E.M. testified she went to the opposite side of the bed and lay flat on her back, where she thought Petitioner could not reach her (*id.*).  She testified Petitioner then started rubbing his hand in a circular motion on top of her vagina over the covers (*id.* at 245).  She testified she waited a couple of seconds and said, "Good night, Ray." (*id.* at 246).  Petitioner asked, "Are you sure that you're not going to have any more bad dreams?"; and she thought to herself, what is he talking about, because she was not having any bad dreams (*id.*).  M.E.M. testified that Petitioner left the room 1–2 minutes later, and she went to Tommy's room five minutes later to make sure that Petitioner was not doing the same thing to him (*id.*).  She testified she locked the door to Tommy's bedroom and lay in his bed waiting for their grandmother to come upstairs the next morning (*id.* at 246–47).

M.E.M. testified that the next morning, Petitioner came to the bedroom door and told them it was time for breakfast (Ex. I2 at 247).  She testified she did not come out of Tommy's bedroom then, but came out when her grandmother came upstairs to get them for breakfast (*id.*).  She testified she briefly told her grandmother what happened, and her grandmother took them home shortly thereafter (*id.* at 247–48).

On cross-examination, M.E.M. testified that when she met Petitioner two years prior, her aunts and uncles made it clear that they did not like Petitioner (Ex. I2 at 250).  She testified she was aware that they thought that her grandmother and Petitioner were living a "sinful" life (*id.* at 250–51).  She testified she did not like her grandmother kissing Petitioner in front of her, and she did not believe that their sleeping together was right (*id.* at 251).  She testified she saw less of her grandmother when her grandmother started dating Petitioner, because the two of them took vacations together (*id.*).

Dr. Spencer, a licensed clinical psychologist, testified he treated M.E.M. (Ex. I2 at 307).  He testified his first treatment session occurred on May 4, 2002, and his most recent session occurred on October 10, 2002, just three weeks prior to the trial (*id.* at 307–308).  He testified that both M.E.M. and her mother attended the first few sessions, but he saw M.E.M. alone after that (*id.* at 308).  Dr. Spencer testified that M.E.M. met the diagnostic criteria for chronic PTSD (meaning, PTSD that occurs for three or more months) (*id.* at 305, 310–11).  He testified that a diagnosis of PTSD requires a person to witness a traumatic event, or feel their life or personal integrity has been

threatened (*id.* at 304, 315–16).  He testified that the person then experiences fear, helplessness, or horror (*id.* at 304).  Dr. Spencer testified that for a period of at least one month, the person experiences a cluster of three symptoms:  (1) persistent re-experiencing of the trauma (for example, flashbacks or dreams), (2) persistent avoidance of stimuli associated with the trauma (for example, avoiding anything or anyone that the person associates with the event), and (3) increased physiological arousal that would cause anxiety, difficulty sleeping, difficulty going to sleep, hyper vigilance (being overly watchful), or a "startle" response (*id.* at 304–05).  Dr. Spencer testified that the rubbing of a twelve or thirteen-year-old's genitals by a man may cause PTSD (Ex. I2 at 316).  He testified that the inability of a patient to recall an important aspect of the trauma can be a symptom of PTSD (*id.* at 312).

On cross-examination, Dr. Spencer testified that the reason he began treating M.E.M. was that she was concerned about depositions in the criminal case, and that no one believed her (Ex. I2 at 315–16).  He testified that he based his diagnosis of M.E.M. upon symptoms and events that were reported to him; and that if those reports were untrue, then either the diagnosis would be false, or the symptoms would be explained by some other traumatic cause (*id.* at 317–19, 326–27).

Angela Martin, M.E.M.'s mother, testified that 6–12 months prior to May of 2001, M.E.M. was developing breasts and pubic hair (Ex. I2 at 329–31).  She testified that M.E.M. and her brother Tommy spent the night at their grandmother's (Ms. Thames') home on May 23, 2001 (*id.* at 331).  She testified that Ms. Thames returned the children home at approximately 7:30–8:30 the next morning (*id.* at 332–33).  M.E.M.'s mother testified that when M.E.M. arrived on the morning of May 24, she was sobbing and crying, her face was pale, she appeared as though she may vomit, she was shaking, and she was crossing her arms across her chest and looking down and "rooting up against me" (*id.* at 333).

M.E.M.'s mother testified that after May 24, 2001, she noticed changes in M.E.M.'s behavior (*id.* at 334).  She testified that during the two weeks that followed, M.E.M. slept in her parents' bedroom, either in the bed with them or on the floor (*id.*).  She testified that for two months after that, M.E.M. slept in an extra bedroom adjacent to her parents' bedroom, but when her baby brother was born, she went back to her own bedroom at the opposite side of the house, but she slept with the door open on a mattress on the floor with either the family dog or her little brother Tommy (*id.*

at 334–35).  M.E.M.'s mother testified that when the dog or Tommy quit sleeping with M.E.M., M.E.M. pulled the mattress into her closet and slept in the closet with the door shut (*id.* at 335).  She testified M.E.M. had been sleeping in the closet for at least ten months (*id.*).  She testified that M.E.M. also had very fitful sleep, which had not been the case prior to May 23, 2001 (*id.* at 336).  M.E.M.'s mother testified that after May 23, 2001, she observed that M.E.M. was fearful of men (*id.* at 337).  She testified that M.E.M. had become watchful and easily startled in public places (*id.* at 337–38).  She testified that prior to May 23, M.E.M. had been a strong, well-adjusted child, but afterward, she became hypersensitive (*id.* at 338).  She testified that during the two weeks after May 23, M.E.M. followed her from room to room, and for the next several months, she refused to be left alone or with her 16-year-old brother (*id.* at 338–39).  M.E.M.'s mother testified that when the family went to Ms. Thames' home for Thanksgiving in November of 2001, M.E.M. acted nervous and serious, and she avoided the upstairs, even though the other grandchildren stayed there (*id.* at 340–41).

M.E.M.'s mother testified that she first took M.E.M. to a psychologist on March 27, 2002, three (3) months after M.E.M.'s deposition in the criminal case (Ex. I2 at 343, 347–48, 355).  She testified that prior to that, in May and June of 2001, she had taken M.E.M. to a family counselor at their church on two occasions (Ex. I2 at 343, 347, 355).

Petitioner testified he was 63 years old (Ex. I2 at 373).  He testified he retired from the Marine Corp in 1976, after twenty years of service (*id.*).  He testified he owned a commercial real estate and brokerage company from 1976–1995, doing business in Arizona, Japan, California, and Alabama (*id.* at 373–74).  Petitioner testified he began devoting all of his time to writing a book in 1996 (*id.* at 374).  Petitioner testified he briefly met Gale Thames, M.E.M.'s grandmother, twice prior to October of 1997, and she was married at both times (*id.*).  He testified that Ms. Thames was divorced when he saw her in October of 1997, and she asked if he wanted to rent an apartment on her property, which he did (*id.* at 375).  He testified that their relationship developed, and they discussed marriage (*id.* at 378–79).  He testified they both had trusts and assets that could not easily be combined, and although they attempted to put together a prenuptial agreement, they were unable to do so (*id.*).

Petitioner testified he thought he would have some privacy at Ms. Thames' home, but her family treated it as their "personal resort," spending every holiday and most weekends there (Ex. I2 at 379).  He testified it was important to him to attempt to maintain a relationship with them, even though he knew that they did not care for him (*id.*).  Petitioner testified he told Ms. Thames that he thought the family was taking advantage of her (*id.* at 381).  He told her it seemed that her children could not take care of their own children by themselves and were always dropping them off at the grandparents' homes (*id.*).  Petitioner denied that he showed any special interest in M.E.M. when she started physically developing (*id.*).  He testified he and Ms. Thames attended a lot of the grandchildren's events, which he had no desire to do (*id.* at 382).  He testified he eventually told Ms. Thames that he was relocating back to Gulf Shores or Perdido Key, and she agreed to go with him (*id.* at 385).  He testified she asked the children if they wanted to buy the house, but they did not, so she put it on the market (*id.*).  He testified that one week prior to May 23, 2001, he and Ms. Thames went house-hunting on Perdido Key and they missed Tommy's graduation (*id.* at 385, 401). Petitioner testified he told M.E.M. that her grandmother was selling the property and moving, and M.E.M. was angry that she would lose close access to her grandmother and her grandmother's home (*id.* at 385, 400).

Petitioner testified that on May 23, 2001, M.E.M. and Tommy arrived at Ms. Thames' house at approximately 6:00 p.m., when it was almost dark (Ex. I2 at 386).  He testified that the children went to bed at 8:30 or 9:00 p.m., and Ms. Thames went to bed between 10:00 and 10:30 p.m. (*id.*). He testified he had told Ms. Thames he would help her with the work she needed to do the next day (*id.* at 387).  Petitioner testified he went to his apartment and showered and shaved, and then went back to her house in his robe and brought his clothes for the next day (*id.* at 386–87).  He testified he did not typically cuddle her when he went to bed so as not to disturb her sleep (*id.* at 388).  He testified they had no particular custom or habit as to who got up first in the morning; it was a "toss-up" (*id.*).  He testified he always put a specific blend of ground coffee in the coffee maker each night, and set the timer on the coffee maker (*id.* at 388–89).  He testified he did that on the night of May 23 (*id.* at 389).  Petitioner testified he never went upstairs on the morning of May 24, but he stood at the bottom of the stairs, slammed the wall, and yelled for the kids to get up after Ms. Thames asked him to get the kids downstairs (*id.* at 390–91).  Petitioner denied that he told Ms.

Thames he went upstairs (*id.* at 392).  He testified that after he banged on the wall, Ms. Thames went upstairs to get the children (*id.*).  He testified that when she came back downstairs, she told him that M.E.M. said he had touched her inappropriately (*id.* at 393–94).  He testified he did believe her (Ms. Thames), but when she assured him that she was serious, he was shocked (*id.* at 394).  He testified he told Ms. Thames he would not stay there "under that type of cloud" and would move to the Bachelor Officers Quarters at the Naval Air Station until "people come to their senses" (*id.*).  He testified he stayed at NAS for a couple of days and then moved into a home in Gulf Shores, Alabama (*id.* at 394–95).

Petitioner testified that Ms. Thames reinitiated contact with him and renewed their relationship (Ex. I2 at 395).  He testified she told him she was having second thoughts about M.E.M.'s accusation, and hoped he would prevail in the criminal case (*id.* at 395–96).  He testified Ms. Thames told him that in August or September of 2001, M.E.M. went back to her (Ms. Thames') house and slept in the same bedroom on several occasions (*id.* at 396–97).  Petitioner denied that he ever went to M.E.M.'s bedroom the night of May 23, 2001, and he denied that he molested her (*id.* at 399–400).

The prosecutor re-called Gale Thames.  She testified that prior to May 23, 2001, she had never considered selling the property (Ex. I2 at 410–11).  She denied that after May 24, 2001, she told Petitioner that she had second thoughts about M.E.M.'s accusations (*id.* at 411).  She testified that she consistently told him that she believed her granddaughter (*id.*).  Ms. Thames also denied that she ever told Petitioner that M.E.M. had returned to her home after May 23, 2001 (*id.* at 411–12).  She testified that she did not remember M.E.M.'s coming back to the property after May 23, 2001 (*id.* at 412).  The prosecutor also re-called M.E.M., who testified that prior to May 23, 2001, no one told her that her grandmother was selling her home and moving (*id.* at 416–17).

B.    Petitioner's "New Evidence"[13]

---

[13] Because Petitioner's "new" evidence fails to satisfy the Schlup standard, as discussed *infra*, the court need not reach the issue of whether Petitioner's evidence that was available at trial but was simply not presented should be considered "new" under Schlup.  That issue appears to be an open question in the Eleventh Circuit.  *See* Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1018 n.21 (11th Cir. 2012) (citations omitted).

Petitioner has now offered several pieces of "new evidence" that he contends individually and collectively establish his actual innocence of the crimes (Ex. 33 at 3).  He identifies the "new evidence" establishing his actual innocence as included in Exhibits A, B, J, M, N, O, P, Q, S, and T of his Section 2254 petition, and he describes it as falling into three categories:  (1) evidence demonstrating that M.E.M.'s accusation was motivated by greed and her desire to preserve her grandmother's property and her grandmother's undivided attention, (2) evidence demonstrating that Gale Thames' testimony was motivated by her desire to "exploit and embezzle" his assets, including money and work he produced regarding the development of a subdivision, and (3) evidence demonstrating that the State Attorney's Office was motivated to prosecute him by its desire to preserve favor with the Thames and Martin families, because both families were influential in the community, and Curtis Golden, the State Attorney for the First Judicial Circuit of Florida, had previously dated Gale Thames (*id.* at 3, 6).[14]

Irrefutable scientific evidence establishing innocence is not required to meet the Schlup standard, but "the Schlup standard is demanding and permits review only in the 'extraordinary' case."  House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006) (quoting McCleskey v. Zant, 499 U.S. 467, 494, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991)).  The "new" evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. *See* Rozzelle v. Sec'y, Fla. Dep't of Corr., 672 F.3d 1000, 1016–17 (11th Cir. 2012) (citation omitted).  The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial" such that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." House, 547 U.S. at 537 (internal quotation marks omitted).  Petitioner's "new evidence" in this case does not satisfy this standard.

1.   Exhibit A

The "new evidence" in Exhibit A is comprised of the following:  (1) a discovery disclosure filed by the prosecutor disclosing, among other things, a laboratory report prepared by Michael

_____

[14] It is public knowledge that at the time of Petitioner's prosecution and trial, Curtis Golden was the State Attorney for the First Judicial Circuit of Florida.  The state court docket reflects that Assistant State Attorney Richard Scherling was assigned to the case on June 18, 2001, and prosecuted the case to its conclusion (*see* Ex. A).

Krupa, a crime laboratory analyst with the Florida Department of Law Enforcement ("FDLE"), (2) Mr. Krupa's report indicating that a fitted sheet and wash cloth were tested and failed to give chemical indications for the presence of blood; a fitted sheet, toilet paper, and wash cloth were tested and failed to give chemical indications for the presence of semen; and a flat sheet was examined microscopically for spermatozoa and none was found, (3) excerpts from the trial transcript reflecting discussions between counsel and the court outside the presence of the jury, and (4) a document produced by Petitioner for defense counsel listing fifty-three items that Petitioner wished counsel to attend to in preparation for the re-trial (doc. 1, Ex. A).

Regarding the FDLE report, given the nature of the molestation (*i.e.*, Petitioner's rubbing his hand in a circular motion on the front and back of M.E.M.'s vaginal area, with one of the rubbings occurring over the covers) and the fact that there was no testimony that M.E.M. bled, that Petitioner touched her with his penis, or that Petitioner ejaculated during the molestation, evidence showing the absence of blood, semen, and sperm was not probative of Petitioner's guilt or innocence.

Regarding the discussion between the court and counsel outside the presence of the jury, the subject of the discussion was the necessity of having Ms. Thames' statement to the Sheriff's Office admitted through testimony of Deputy Wigen, the person who took the statement, instead of having it admitted through Lieutenant Onkka, the records custodian.  The parties agreed that Onkka could provide sufficient foundational testimony for admission of the statement.  The discussion is not fact evidence, it is legal argument.  Therefore, there is no possibility that a properly instructed juror would have considered this discussion in deliberating Petitioner's guilt.  Similarly, Petitioner's "to-do" list to defense counsel is not evidence and would not have been properly considered by the jury. Petitioner has failed to show that no reasonable juror—considering this "new evidence" with the evidence available at trial—would still find him guilty beyond a reasonable doubt.

2.   <u>Exhibit B</u>

The "new evidence" in Exhibit B is comprised of one page of a multi-page offense report from the Santa Rosa County Sheriff's Office (doc. 1, Ex. B).  The page states that a medical examination of the victim was conducted on May 29, 2001, with negative findings of sexual abuse.

Again, given the nature of the molestation (Petitioner's rubbing his hand on her vagina), the absence of physical findings of sexual abuse on the victim's body was not probative of Petitioner's guilt or innocence.  Therefore, Petitioner has failed to show that no reasonable juror—considering this "new evidence" with the evidence available at trial—would still find him guilty beyond a reasonable doubt.

        3.      Exhibit J

The "new evidence" in Exhibit J is a copy of <u>Gould v. State</u>, 745 So. 2d 354 (Fla. 4th DCA 1999).  In <u>Gould</u>, the Florida Fourth District Court of Appeal held that, during the defendant's trial on two counts of sexual battery, the trial court erred by admitting expert testimony that the victim exhibited characteristics consistent with a child who had been sexually abused, without first finding that the use of PTSD, or the profile characteristics, to deduce whether a child has been sexually abused is generally accepted by the psychological community.  745 So. 2d at 356–57.  However, the <u>Gould</u> court additionally held that the error was harmless, because:  (1) the expert still would have testified that the victim suffers from PTSD and that sexual abuse can bring about PTSD; (2) the expert further could have testified, as she did, that there were no other factors in the victim's life that could have caused him to suffer from PTSD; (3) there was evidence that the victim's behavioral problem increased dramatically after the abuse occurred; and (4) there was great consistency in the victim's allegations to a detective, to the expert, and to the jurors themselves.  *Id* at 357.

The <u>Gould</u> decision is not evidence, nor is it the proper subject of a jury instruction.  Therefore, properly instructed jurors would not have considered it, and it could not possibly have affected the verdict.

        4.      Exhibit M

The "new evidence" in Exhibit M is a copy of defense counsel's motion seeking payment for the services of James D. Larson, Ph.D., an expert appointed by the court to assist defense counsel (doc. 1, Ex. M).  The motion states that although Dr. Larson's testimony at trial was unnecessary, he expended a substantial amount of time in assisting counsel (*id.*).

Defense counsel's motion is not evidence, nor is it probative of Petitioner's guilt or innocence.  Therefore, properly instructed jurors would not have considered it, and it could not possibly have had an effect on the verdict.

5.   Exhibit N

The "new evidence" in Exhibit N is comprised of the following:  (1) defense counsel's motion to permit Dr. Larson to be present during trial, (2) two facsimiles from defense counsel to the prosecutor describing Dr. Larson's anticipated trial testimony, and (3) a transcript of Dr. Larson's deposition (doc. 1, Ex. N).  Assuming that Dr. Larson's trial testimony would have been consistent with his deposition testimony, the jury would have heard him testify that in the past five years, he had treated six or fewer children for being victims of sexual abuse, and in that same time period, he had treated approximately six people for PTSD caused by child sexual abuse (*id.*).  The jury would have heard him testify that although child sexual abuse can cause PTSD, there are a variety of causes of PTSD; and if a patient presents symptoms of PTSD, sexual abuse may or may not be the cause (*id.*).  He additionally would have testified that the following hypothetical circumstances would not indicate or be consistent with "trauma" and thus would not support a diagnosis of PTSD:  a child reports that she was sleeping and awoke to someone rubbing her genitals in a circular motion; and she reports she left the room, went to a bathroom, stayed in the bathroom for five minutes, went back in the same room, and the person again rubbed her genitals in a circular motion (*id.*).  Dr. Larson would have testified that a PTSD diagnosis typically requires avoidance, that is, the patient trying to avoid the traumatic stimulus (*id.*).  He would have testified that the fact that the child in the hypothetical returned to the same room where the event occurred suggested she was not trying to avoid the stimulus and thus was not traumatized by it (*id.*).  Dr. Larson would have testified that he could not say whether or not M.E.M. suffered from PTSD without conducting a full evaluation, but he could say that the molestation event she described did not meet the diagnostic criteria for PTSD, specifically, the "trauma" criteria, since she returned to the bedroom instead of avoiding the allegedly traumatic stimulus (*id.*).

Considering Dr. Larson's proposed testimony in totality with the evidence that the jury heard, including (1) the testimony of M.E.M., who was twelve years old at the time of the

molestation, regarding the reason she returned to the bedroom, (2) the testimony of M.E.M.'s mother regarding the changes in M.E.M.'s behavior after the molestation, (3) the testimony of Dr. Spencer, M.E.M.'s treating clinical psychologist, that he evaluated her and diagnosed her with PTSD, and (4) defense counsel's cross-examination of Dr. Spencer, during which Dr. Spencer admitted that his diagnosis was based upon symptoms and events reported to him by M.E.M. and her mother, and if those reports were untrue, then either the diagnosis would be false, or the symptoms would be explained by some other traumatic cause besides sexual abuse, Petitioner has failed to show that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt if the jury had heard Dr. Larson testify that hypothetically, a person's returning to the allegedly traumatic stimuli negates a PTSD diagnosis.  Therefore, this "new evidence" in insufficient to satisfy the <u>Schlup</u> standard.

      6.    <u>Exhibit O</u>

      The "new evidence" in Exhibit O is Dr. Larson's answers to questions submitted to him by Petitioner, through Petitioner's post-conviction counsel, after the post-conviction evidentiary hearing on Petitioner's first Rule 3.850 motion (doc. 1, Ex. O).  Dr. Larson's written answers are not sworn to under penalty of perjury, which leaves the court to speculate as to whether Dr. Larson actually would have testified to this information, and thus diminishes the reliability of Petitioner's "new evidence."  Further, most, if not all, of the information in Dr. Larson's answers is not factually probative of or legally relevant to Petitioner's guilt.  For example, some of Petitioner's questions relate to the reasonableness of trial counsel's decision not to call Dr. Larson as a witness for the defense, and others relate to the reasonableness of trial counsel's cross-examination of Dr. Spencer (*see* Ex. O, questions 1–13, 25–30, 32).  Dr. Larson's opinions on these matters has no tendency to prove or disprove whether Petitioner molested M.E.M.; therefore, there is no possibility it would have affected on the verdict.  Other questions posed to Dr. Larson by Petitioner relate to whether Dr. Spencer violated certain obligations under the APA Code of Ethics during and after his treatment of M.E.M. (*see* Ex. O, questions 14–19, 21–24).  Again, Dr. Larson's opinions on these ethical

questions are not probative of Petitioner's guilt; therefore, there is no possibility they would have affected the verdict.[15]

Petitioner has not shown it is more likely than not that no reasonable juror would have found him guilty in light of the information provided in Dr. Larson's answers to Petitioner's post-conviction questions.  Therefore, this "new evidence" fails to satisfy the <u>Schlup</u> standard.

　　　　　　　7.　　<u>Exhibits P and Q</u>

The "new evidence" in Exhibits P and Q is comprised of items which, according to Petitioner, were taken from his residence by Gale Thames, acting at the direction of Assistant State Attorney Scherling, without a search warrant or other authorization (doc. 1, Exs. P, Q).  Petitioner contends the nature of some of the items (*i.e.*, documents showing that Gale Thames provided the prosecutor with an account number and expiration date of Petitioner's credit card and the password to one of Petitioner's financial accounts documents, and documents showing that Petitioner invested time and money assisting Ms. Thames with plans to develop and sell property she owned) and the manner in which the items were taken from his residence (*i.e.*, without a search warrant or Petitioner's authorization), suggest that Ms. Thames and the State Attorney's Office conspired to prosecute and convict him in order to "exploit and embezzle [Petitioner's] finances and proprietary work product" and preserve Ms. Thames' family's wealth, power, and influence in the community (doc. 33 at 3, 6).

Evidence that Ms. Thames provided Petitioner's financial information and "work product" to the prosecutor does not reasonably suggest that M.E.M. fabricated the molestation accusation and her mother and grandmother perpetuated it, in an effort to preserve the family's wealth and influence.  Therefore, no juror could draw from this evidence a reasonable inference of improper motive. Petitioner has not shown it is more likely than not that no reasonable juror would have convicted him had the jury known that Ms. Thames provided Petitioner's financial information and "work product" to the prosecutor.   Therefore, this "new evidence" does not satisfy the <u>Schlup</u> standard.

---

[15] Dr. Larson indicated he was unable to answer Petitioner's remaining two questions (questions 20 and 31).

8.      Exhibit S

Petitioner's Exhibit S contains excerpts of M.E.M.'s and Gale Thames' depositions (doc. 1, Ex. S). Petitioner contends M.E.M.'s statements that neither she nor her family liked Petitioner, and that Petitioner was not friendly, would have shown that he did not fit the profile of a child molester, because he was not friendly or charming around children. This "new evidence" would have been cumulative. M.E.M. testified at trial that prior to her entering 6th grade, Petitioner "wasn't very welcoming" and did not seem to like children. Additionally, the jury heard evidence that Ms. Thames' children, including M.E.M.'s mother, did not like Petitioner. Petitioner has not shown it is more likely than not no reasonable juror would have convicted him if the jury had heard additional evidence of this nature.

Petitioner does not suggest how the remaining deposition testimony demonstrates his factual innocence. He made notations on some of the pages suggesting that certain statements by Ms. Thames and M.E.M. were inaccurate, but defense counsel brought out some of that information during cross-examination and during Petitioner's testimony. Petitioner has not shown that the impeachment value of the inconsistencies and inaccuracies that defense counsel failed to bring out at trial was so great that it is more likely than not that no reasonable juror would have convicted him had the jury heard it. Therefore, the "new evidence" included in Exhibit S fails to satisfy the Schlup standard.

9.      Exhibit T

The "new evidence" in Exhibit T is a copy of the trial court's order directing Dr. Spencer's office to produce M.E.M.'s psychological counseling and treatment records (doc. 1, Ex. T). Exhibit T also includes the treatment records (id.). Dr. Spencer testified regarding his evaluation and treatment of M.E.M. Petitioner has not identified any additional information from her mental health records that possibly would have affected the jury's verdict. Therefore, this "new evidence" fails to satisfy the Schlup standard.

To summarize, Petitioner has not offered sufficient "new evidence" of the powerful kind that would, individually or collectively, "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327 (emphasis

added).  Petitioner's failure to make a colorable showing of actual innocence renders him unable to obtain federal review of the claims asserted in his untimely Section 2254 petition.

III.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That Respondent's motion to dismiss (doc. 30) be **GRANTED**.

2.      That the petition for writ of habeas corpus (doc. 1) be **DISMISSED** with prejudice as untimely.

3.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 11th day of July 2014.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**